ARNHOLD & CO., INC., ET AL. v. UNITED STATES[1]

United States Customs Court, First Division

(Decided October 11, 1938)

*Barnes, Richardson & Colburn* (*Albert Mac C. Barnes, Samuel M. Richardson,* and *Hadley S. King,* of counsel) for the plaintiffs.
*Charles D. Lawrence,* Acting Assistant Attorney General (*Marcus Higginbotham, Jr.,* special attorney, and *James F. Donnelly,* junior attorney), for the defendant.

Before McCLELLAND, SULLIVAN, and BROWN, Judges; McCLELLAND, P. J., dissenting

SULLIVAN, Judge: These protests involve the dutiability of certain dogskins imported from China in 1932 and 1933.

[1] C. D. 44.

The collector of customs assessed the merchandise at 25 per centum ad valorem under paragraph 1519 (a) of the Tariff Act of 1930. The applicable portion of this paragraph is as follows:

PAR. 1519. (a) Dressed furs and dressed fur skins (except silver or black fox), and plates, mats, linings, strips, and crosses of dressed dog, goat, or kid skins, 25 per centum ad valorem * * *.

It will be observed that this provision relates entirely to furs, fur skins, and articles made from skins, which have been *dressed*.

The plaintiffs contend by their protests that these dogskins are dutiable at 20 per centum ad valorem under paragraph 1558 or free of duty under paragraph 1681 of said act.

These provisions are as follows:

PAR. 1558. That there shall be levied, collected, and paid * * * on all articles manufactured, in whole or *in part*, not specially provided for, a duty of 20 per centum ad valorem.

PAR. 1681. Furs and fur skins, not specially provided for, *undressed*. [Italics ours.]

The issue involved herein has been previously passed upon in *Rotberg & Krieger* v. *United States*, T. D. 48068, 68 Treas. Dec. 895, affirmed by the Court of Customs and Patent Appeals in 24 C. C. P. A. 441, T. D. 48902, the holding of the appellate court being that the merchandise, being undressed furs, is enumerated, and hence the provisions of paragraph 1558 are not applicable. The merchandise was held free of duty under paragraph 1681 as *undressed* fur skins, not specially provided for.

In that case the court was of opinion that the work done on the skins in China was for the purpose of preservation, rather than dressing, inasmuch as the powder used to preserve the skins was removed before they were dressed in this country.

At the opening of the trial of the case at bar plaintiffs moved the incorporation of the record in the *Rotberg & Krieger* case, *supra*. There being no objection on the part of the Government, the motion was granted. The plaintiffs then rested.

The record in the case at bar is unusually voluminous. The minutes of the trial, including the testimony, are in two volumes, totalling 1,439 pages. The briefs of counsel are very far from being brief, plaintiffs' being of 49 pages; and defendant's, 199.

At the close of the trial the court stated that the list of seven protests heading this opinion were representative cases, and the testimony was taken as to such causes. On motion of plaintiffs the court ordered a long list of other protests consolidated therewith. An itemized list of such protests is hereto attached and made part of this opinion.

The decision and judgment in this case will therefore apply not only to the seven protests embraced in the title, but to the consolidated cases listed herein.

After the incorporation of the previous record, the defendant introduced the testimony of 15 witnesses, and the plaintiffs the testimony of 30 witnesses in rebuttal.

The record presents three questions: (1) Are the skins dressed or undressed? (2) If not dressed or undressed, are they articles manufactured in whole or in part, not specially provided for? The latter question was raised by the briefs and not stressed by the testimony. (3) Are they free of duty by virtue of paragraph 1681?

*First:* The first question to be answered is: Are the skins dressed or undressed?

In the original record received in evidence it was established that the merchandise was not dressed. The method of preparation of the merchandise for the purpose of transportation was fully described by many witnesses. The lower court found that such preparation was not a dressing as provided by the statute, and sustained the protests' claim that the merchandise was entitled to free entry. The Court of Customs and Patent Appeals affirmed that decision. We will reiterate some of the testimony in that case, as the weight of the testimony in the present case sustained the evidence of the prior witnesses.

The witness Bernstein in the previous case testified as to Collective Exhibit 1 in that case, which is Collective Exhibit 1 in the present case, that he was in China in 1930 and 1931, and saw the dogskins "as they came from the pelt of the animal"; that he saw them processed into merchandise such as Exhibit 1 in Tientsin and Mukden, China, in about 100 factories; that the process was the same in all those factories; that during November and December, when it was very cold, the skins were piled up and allowed to lie in the pile until such time as they could be fixed to preserve them and keep them in good shape for shipment. Next, when the weather became a little warmer, a few layers of the excess fat and dirt on the skins were removed. Then the skins were put in the sun for drying. After drying they were placed in barrels of water and flour, where they remained for six or seven days. They were then removed from the barrels and placed in the sun to dry. When this was done they were picked up and made ready for shipment by packing in bales of 200 or 300 skins by the use of "press packing machines."

He testified that the purpose of subjecting the dogskins to this process was *"to preserve them and keep them in proper shape, to allow them to be shipped, so that they do not deteriorate while in transit."* [Italics ours.]

He further testified that the condition of the dogskins in Collective Exhibit 1 is the same as those he saw processed in China.

On cross-examination he testified he did not consider the described process a dressing process, *and it is not the Chinese way of dressing dogskins*. The salt used in China was sea salt in water, and its purpose was for preservation. This preservation is not part of a dressing process.

This testimony was corroborated by practically every witness for the plaintiff in the prior case. It is very much the same in the case at bar as to plaintiffs' testimony.

Against this in the case at bar we have the testimony of two or three scientific witnesses who intimate that what was done in China was a dressing process.

Defendant's witness, Ashbrook, testified his work was scientific in nature and conducted along research lines; that he never operated a tanning or dressing plant anywhere; that all his conclusions are based upon viewing certain skins, and judging from appearance and feel whether they are dressed; that he never saw any dogskins processed in plants in the United States or abroad. Despite his lack of practical experience he was of opinion that these skins were dressed.

The testimony of defendant's witness, Schnopper, in the present case indicated there were some elements of dressing in this merchandise. He concluded that the percentages of aluminum, sodium sulphate, and sodium chloride in the samples were in excess of what would be present in a natural raw skin. He admitted that these chemicals would be present in a natural raw skin, but the aluminum in the imported articles was five times as much as he found in the raw skin; the sodium sulphate, three times as much; and the sodium chloride, five to six times as much; that he did not know of his own knowledge that the skins he analyzed as raw skins were actually raw, but somebody told him they were raw; that there was some starchy substance or flour on the hair of Exhibit 1; that he did not know whether it was millet flour, nor whether millet flour contains aluminum; that the aluminum he found in his analyses could not have come from dirt or clay because it was soluble, whereas the aluminum in dirt or clay is insoluble; that the aluminum in Collective Exhibit 1 is there combined with the protein matter of the skin; that there would not be that much in the live dog; that he believed something was added containing aluminum, probably aluminum sulphate, which is a drying and preserving agent; that salt is also a drying and preserving agent, but salt and aluminum sulphate are not of the same character and are used for different purposes.

The other scientific witnesses on the part of the defendant testified along similar lines.

This testimony in connection with the remaining testimony of defendant's witnesses is not sufficient to overcome the testimony of

witnesses on behalf of the plaintiffs, who saw the process of preserving these dog skins for the purpose of exportation and transportation. All the witnesses testified that this process of curing or preservation was not a process of dressing. It therefore appears without doubt that this merchandise was not dressed within the terms of the statute and the meaning of the term "curing or preservation."

The complete record, as we have examined it, sustains the fact that this merchandise is not dressed fur skins within the provisions of paragraph 1519 (a). We are therefore satisfied and so hold it was not correctly classified.

We need not set out the testimony of the present record on this question as it would be merely cumulative.

*Second:* The second question discussed is whether these dogskins are "articles manufactured in whole or in part, not specially provided for," and therefore dutiable under paragraph 1558.

This claim is set out in the protests, but in the entire record, as far as we have been able to find, it was not stressed by any of the witnesses. It is urged by defendant in its brief. The defendant now seeks a holding that, if the court is of opinion that this merchandise is undressed, it be held dutiable under the second clause of paragraph 1558 heretofore quoted, at 20 per centum ad valorem, as *nonenumerated* articles manufactured in whole or in part. The claim that it is partly manufactured is based largely on the scientific testimony that it is partly dressed and therefore must be partly manufactured.

If an article is manufactured it is to be presumed there is a motive for such manufacture, or an object in view into which the material may be transformed. There is nothing to indicate such motive or object in the case at bar. What was done with this merchandise was not any idea of manufacturing it in whole or in part. The thought of the Government all through the trial was that this merchandise is dressed, and a dressed furskin is not strictly speaking a manufacture, for it is not made into a fur article. It is the fur article that is a manufacture. The dressing of the skin is merely to fit it to become a manufacture, or to put it into condition so that it may become a manufacture. There cannot be any other construction. What was done to these skins to indicate they were manufactured in whole or in part? The mere finding of aluminum, sodium sulphate, and sodium chloride, is the basis upon which the Government must stand if this merchandise is manufactured in whole or in part.

This court and the appellate court have held that this merchandise is *undressed* furs. That holding does not aid the claim that these skins are manufactured in whole or in part. The issue in the prior case was the very one here involved, and the holding was very specific that this merchandise being undressed furs is enumerated, and hence the pro–

visions of paragraph 1558 are not applicable, and what was done to these furs in China did not amount to a manufacture.

The appellate court in the *Rotberg* case, *supra*, in analyzing paragraph 1558, *supra*, stated (page 444):

As to the alternative claims under paragraph 1558, *supra*, the brief for appellee argues against both, urging that, in its imported condition, the merchandise is not a manufactured article, and also that it is not a nonenumerated unmanufactured article. It is insisted that it is *enumerated* in the free list, either in paragraph 1681, *supra*, or in paragraph 1765, *supra*. Notwithstanding the adverse argument by appellee's counsel, however, there is no formal abandonment of the claims so alternatively made in the protest, and in the concluding paragraph of the brief the "nonenumerated unmanufactured article" claim is specifically reiterated as an alternative, if the merchandise be not found free of duty as claimed.

\* \* \* \* \* \* \*

\* \* \* As has been stated, merchandise seemingly similar to that here at issue, was held, upon the testimonial record made up in the *Arnhold & Co.* case, *supra*, to be neither "dressed" nor *undressed*, but *partly* dressed. Even were such finding made here there could not be a classification by similitude for the reasons already given, but here we have a different testimonial record, and we think it here has been established (as it was not there established) that the treatment given the merchandise in China, including, of course, the use of the flour, did not constitute a dressing process, and that the merchandise in the condition as imported was not dressed furs or dressed fur skins within the meaning of paragraph 1519 (a), *supra*. Further, we think that the merchandise, being undressed furs, is enumerated and hence there is no place for the application of either provision of paragraph 1558, *supra*. Certainly "Furs and fur skins \* \* \* undressed" is an enumeration and is more specific than either "raw or unmanufacture" articles," or "articles manufactured, in whole or in part." \* \* \*

There is a complete answer to the question as to these skins being unenumerated articles manufactured in whole or in part. The merchandise is enumerated in the tariff act, and, as the court holds, to fall within the provisions of paragraph 1558, which apparently is a catch-all provision, the merchandise must not be enumerated.

Paragraph 1519 (a), being the statute under which these skins were classified, directly specifies *dressed* furs and dressed furskins, also various articles made from dressed dog, goat, or kid skins. Subsection (b) of the same paragraph provides for manufactures of fur further advanced than dressing, prepared for use as material. Subsection (c) of the same paragraph refers to silver or black fox furs or skins, dressed or undressed. Both furs and furskins are enumerated in these subsections of the statute. Each subsection provides for its own classification. Therefore, furs and furskins are provided for, and cannot fall within paragraph 1558, which is merely the catch-all paragraph for articles *not* enumerated or provided for elsewhere in the tariff act. In other words, in order to fall within paragraph 1558 an article must be nonenumerated in every particular.

We feel that not only are these articles enumerated, being furskins, but that they have not even been partly manufactured, the weight of

the evidence indicating that the flour or powder thereon at the time of importation was placed thereon, not as a process of manufacture, but merely as a preservative to be removed before the furskins are dressed in this country after importation.   On this question the weight of the evidence indicates that these skins could not be used in their imported condition, or made in their imported condition into a garment or article ready for use.   Further, that these skins must be dressed in the United States before they can be manufactured into fur articles. The fact that some of the evidence indicates that salt may have been added besides the flour or powder before exportation merely emphasizes that preservation was the purpose in mind prior to exportation from China, and not manufacture.   A temporary preservation which does not serve any purpose in the manufacture or dressing of these dogskins after importation, but rather is a detriment thereto, because the preservative or preservatives have to be removed, cannot render these dogskins in their imported condition "articles manufactured   *   *   * in part" within the meaning of those words in paragraph 1558, even if they were "not enumerated or provided for" in the tariff act, and we are convinced they are provided for as furskins, undressed, under paragraph 1681.   For the sake of argument, if these are *not* furskins and are manufactured, should they *not* have been classified under the second part of paragraph 1558?   The fact that they were not indicates the collector was of opinion that they were furskins, the only controversy being as to whether they were dressed or undressed.   Presumptively, therefore, they are furskins, and this presumption has been supported by proof and by the samples themselves.   They cannot therefore be nonenumerated articles, and so are not within paragraph 1558.

That they are not manufactured in part is indicated by the following: In the matter of the protest of A. L. Causse Manufacturing Co., G. A. 4439, T. D. 21156, 1 Treas. Dec. 1002, the merchandise involved was orange peel preserved in brine in casks.   General Appraiser Tichenor of the Board of General Appraisers, now this court, said:

In our opinion, the term "preserved" is used in the tariff act in its ordinary and popular signification—that is to say, saved from decay by the use of some preservative substance, as sugar, salt, etc.   *   *   *

This holding was affirmed without opinion by the United States Circuit Court for the Southern District of New York (see T. D. 21948, 3 Treas. Dec. 87).

In a similar case brought before the Board of General Appraisers by the same importer (T. D. 26368, G. A. 6039, 9 Treas. Dec. 852) General Appraiser Somerville commented on the prior case and said:

*   *   *   The Board after due consideration overruled the protest, holding that orange peel in brine was dutiable as "orange peel preserved," within the

meaning of said paragraph 267 (Tariff Act of 1897), the word "preserved" being held to be used in its ordinary and popular signification—that is to say, to save from decay by the use of some preservative substance.

In that case as in the case at bar the merchandise was temporarily preserved "to prevent decay in transit" and "the brine served no other purpose except to preserve it up to the time" it was further processed in this country.

That case was reversed by the Circuit Court for the Southern District of New York (150 Fed. 419, T. D. 27513), Judge Wheeler stating:

> The brine is a mere covering or packing for protection in transportation, as from cold or heat, and which when separated from the peel leaves that in its natural state, as the taking off of any covering would; and that by this protection the peel is not preserved, as such fruits or fruit products are within the meaning of the tariff law.

It must be constantly kept in mind that what was done to these skins in the United States was irrespective of the work that was done in China. Whether or not these skins were fully preserved or partially so in China, all the material used in such preservation in China was washed out or removed in the United States, and the skins restored to their natural condition. The processes through which these skins passed in the United States to fit them for ultimate use were all the processes that were necessary to render them dressed skins. Every necessary process of dressing took place in the United States, and what was done to these skins in China was without any assistance or benefit to their dressing in the United States. Therefore, the facts fully warrant the holding that this merchandise did not receive a single element of manufacture in China that was of any use to their dressing or manufacture in the United States; that what was done in the United States was for the purpose of fully dressing the skins and rendering them usable material for manufacture into fur articles or garments. The authorities fully sanction this holding, and a re-reading of the testimony is convincing that what was done in China had not any reference to dressing, and was wholly useless in the manufacture of these skins. Therefore, the elements of dressing and manufacture have been driven out of this case by the overwhelming weight of the testimony.

It is true that some of defendant's witnesses testified that this merchandise was dressed, but on cross-examination, when their attention was called to the materials used in China, it was admitted that they were not used for the purpose of dressing in China. Manufacturing, if any, was to the same extent, and the use of temporary preservatives in China could not constitute a manufacture. The skins were merely temporarily preserved and in their natural state when the

preservative was removed in this country. They certainly were not partly manufactured.

In *Ishimitsu v. United States*, 11 Ct. Cust. Appls. 186, T. D. 38963, the court said at page 191:

The record here establishes that this seaweed is a food product. Shoyu is a sauce for fish or vegetables. This sauce has been placed with the seaweed, the combination boiled and packed in hermetically sealed cans. It is difficult to understand how or why seaweed thus treated can be said to be seaweed manufactured. It has not been manufactured into any thing different than what it first was, namely, a food product. Certainly the preservation thereof, which is accomplished by hermetically sealing in tin cans, *is not necessarily a process of manufacture.* This seaweed may be and probably is advanced in condition, but that of itself does not necessarily constitute a manufacture. * * * [Italics ours.]

The protest, claiming the seaweed classifiable under paragraph 372 of the Tariff Act of 1913, as "seaweeds, if manufactured," was over-ruled by the Board of General Appraisers (now this court) in its decision reported in Abstract 44095, 39 Treas. Dec. 482, and affirmed by the appellate court in the foregoing opinion, the appellate court holding that "the importer has failed to establish his contention that the importation is seaweed manufactured."

We think there is stronger reason for holding the dogskins at bar *not* to be an article manufactured "in whole or *in part*," than there was for the appellate court to hold the seaweed referred to in the *Ishimitsu* decision, *supra*, not to be seaweed manufactured. Para-phrasing part of the appellate court's remarks above quoted, we are of opinion that it is difficult to understand how or why dogskins *temporarily preserved* for transportation purposes can be said to be articles manufactured in whole or in part, or, as held by the collector, "dressed fur skins" under paragraph 1519 of the present tariff act.

We therefore adhere to our holding in the prior case that these dogskins are fur skins undressed, and free of duty as such under para-graph 1681.

The protests are sustained. Judgment for plaintiffs.

DISSENTING OPINION

McCLELLAND, Presiding Judge: The merchandise which is the subject of these protests consists of dogskins imported from China. The classification that skins in the condition of those involved, and the rate of duty that should be assessed thereon, have been litigated in this court in different forms in a number of cases. The collector assessed duty on the involved skins at the rate of 25 per centum ad valorem under the provisions of paragraph 1519 (a) and the alterna-tive claims in each of the protests are that the skins are entitled to free entry under the provisions of paragraph 1681, or if not entitled

to such free entry then that they should have been assessed with duty only at the rate of 20 per centum ad valorem under the provisions of paragraph 1558, all of the Tariff Act of 1930.

The pertinent portions of these paragraphs read as follows:

PAR. 1519. (a) Dressed furs and dressed fur skins (except silver or black fox), and plates, mats, linings, strips, and crosses of dressed dog, goat, or kid skins, 25 per centum ad valorem * * *.

PAR. 1558. That there shall be levied, collected, and paid on the importation of * * * all articles manufactured, in whole or in part, not specially provided for, a duty of 20 per centum ad valorem.

PAR. 1681. (Free List) Furs and fur skins, not specially provided for, undressed.

From the whole trend of the trial it is evident that the claim relied upon is that for free entry under paragraph 1681, but the alternative claim under paragraph 1558, not having been abandoned, still stands, and counsel for the Government in their brief, while pressing for the rate assessed by the collector, make forcible argument in support of the claim under paragraph 1558 in the event that the court finds that the skins are not dressed.

After exhaustive study of the entire record, including the record in the case of *Rotberg & Krieger* v. *United States*, protest 642199–G, which was incorporated herein, and of the decisions of this court and of the Court of Customs and Patent Appeals in that case, reported in T. D. 48068 and in 24 C. C. P. A. 441, T. D. 48902, respectively, I am satisfied that the skins in the cases at bar are not dressed within the meaning of that term as used in paragraph 1519 (a), *supra*. As was pointed out in the opinion of Judge Sullivan in the *Rotberg & Krieger* case, *supra*, and in the unanimous opinion of the Court of Customs and Patent Appeals affirming said decision, it is the meaning of the term "dressed" as understood in the trade of the United States which governs. From the testimony offered by both the plaintiffs and the defendant herein, it appears that that term, as applied to fur skins, refers to one which, after certain preliminary operations such as fleshing, has been tanned or leathered in a dressing bath, and has also been subjected to certain after-operations such as kicking or drumming to soften the skin, the application of oil or grease to the skin, and the cleaning thereof to remove excess dirt, grease, etc., acquired during the dressing process.

It is the contention of the Government that the skins in issue were tanned or leathered by means of what is called the fermentation or Schrot-Beize method, or a modification thereof. It is claimed that in this process flour, water, and chemicals, including sodium chloride and sodium sulphate, are used to make a fermentation liquor in which the skins are placed for varying lengths of time, and that the lactic and acetic acids formed in the liquor act upon the skins in the same

way that the salt and alum bath, which it is undisputed is the usual method employed in the United States in the dressing of fur skins, tans such skins. During the trial of the issue in the *Rotberg & Krieger* case, *supra*, four witnesses testified on behalf of the plaintiff that the skins in issue were subjected to immersion in a solution consisting of flour and water, so that whatever were the actual constituents of the bath in which the skins were so immersed in China, it appears undisputed that flour was one of the ingredients.

At the time the skins included in Collective Exhibit 1, which it is agreed came from one of the shipments involved in the *Rotberg & Krieger* case, and are similar to those involved in the present case, were originally received in evidence, they had on both the hair and leather side, a fine powdery deposit which the plaintiffs claim is part of the flour used in the bath in which they were immersed in China. All of the witnesses interrogated as to what that powdery substance was identified it as starchy material, evidently derived from flour.

It is obvious, therefore, that even assuming for the sake of argument that the skins in issue had been tanned by the fermentation process, the after-operations of oiling and cleaning were not performed on the skins in Collective Exhibit 1, otherwise the flour residue would not still be on both sides of such skins.

While there is some testimony to the effect that cleaning and straightening of the hair of fur skins are not dressing operations, I think a preponderance in both weight and volume of the evidence indicates that the cleaning operation, at least, is an essential part of the process of dressing, even if the straightening operation is not.

The conclusion therefore follows that the skins in issue were not dressed within the meaning of that term as used in paragraph 1519 (a), *supra*, and compels a consideration of the question whether the skins in issue are "undressed" within the meaning of that term as used in paragraph 1681, *supra*, or are "articles manufactured, in whole or in part," provided for in paragraph 1558, *supra*.

In their testimony given in the *Rotberg & Krieger* case, *supra*, such of the plaintiffs' witnesses as were interrogated on the point were unanimous in declaring that after the flesh had been scraped off the skin in issue nothing had been done to them save to immerse them in a solution consisting of flour and water. During the course of the trial in the case at bar witnesses for both the Government and the plaintiffs demonstrated that the foregoing was not literally true, and, indeed, plaintiffs seem to have receded from that stand to the extent of admitting that salt or a solution of salt was used in the preparation of the skins in issue.

Analyses of portions of identical skins taken from Collective Exhibit 1 were made by qualified chemists on behalf of the plaintiffs and defendant. This member of the court has long since ceased to

wonder why the results of analyses made by chemists of apparently equal qualifications, working on identical samples, vary so widely on important matters. To illustrate: Defendant's witness, Serfass, unquestionably a qualified chemist, testified that he analyzed a portion of Exhibit 1–W with the following results:

Aluminum (calculated as Aluminum Oxide)_____ 1. 15%
Sulphates (calculated as Sodium Sulphate)_____ 1. 34%
Chlorides (calculated as Sodium Chloride)_____ 5. 02%

Plaintiffs' witness, Blair, likewise a qualified chemist, also analyzed a portion of Exhibit 1–W, with these results:

Aluminum Oxide_____ . 34%
Sulphates_____ 1. 37%
Chlorides_____ 4. 92%

It will be readily seen that so far as sulphates and chlorides are concerned the results are in practical agreement, but as to the quantity of aluminum oxide contained in the skin the results are irreconcilable. The last named is the most important ingredient from the standpoint of this case, since it has been testified by both plaintiffs' and defendant's witnesses that certain forms of alumina, represented in analysis by aluminum oxide, are tanning materials.

It has been testified by plaintiffs' witness, Rogers, a consulting chemical engineer, specializing in leather and fur problems, that in order to indicate dressing by the so-called alum and salt method analysis of a fur skin would have to indicate the presence of 2½ to 3 per centum of alumina. While offhand this testimony might be interpreted as indicating that the skins in issue were not dressed, it should be noted that the Government makes no contention that they were dressed by the alum and salt method. Based upon comparison with analyses made of raw dogskins by Government Chemist Schnopper, the results of which are given in the record at page 248, it would appear that the quantity of aluminum oxide found by Government witness, Serfass, in the portion of Exhibit 1–W which he analyzed was approximately six times the quantity found in raw dogskins, while the aluminum oxide found by plaintiffs' witness, Blair, in the portion of Exhibit 1–W which he analyzed was nearly twice that found in raw dogskins. If the analysis made by witness Serfass, showing 1.15 per centum of alumina, be correct, it can scarcely be disputed that the presence of alumina, represented in analysis by aluminum oxide, in a skin to an amount approximately one-half that required to tan properly the skin should have some effect along that line.

The results found by the Government chemists, which indicate that the skins in issue were subjected to chemical treatment for the purpose of tanning them, are borne out by the photomicrographs offered by the Government and received in evidence as Government Exhibits 12

and 13, and Government Collective Exhibit 14, together with the testimony given thereon by the witnesses Serfass and Theis, the latter an industrial biochemist specializing in leather and fur problems.

Government Exhibit 12 is a photomicrograph taken by the witness Serfass of a portion of Collective Exhibit 1. Government Exhibit 13 is a photomicrograph taken by the same witness of a portion of Collective Exhibit 1 which he testified had been soaked in water for twenty-four hours. Government Collective Exhibit 14 consists of two photomicrographs, also taken by Mr. Serfass, one of a portion of raw dogskin which he testified had been soaked in water for twenty-four hours, and the other of a portion of a raw dogskin which the witness testified had not been soaked.

Testifying with regard to these photomicrographs, Dr. Theis stated that each of the two photomicrographs in Government Collective Exhibit 14 exhibits the characteristics of an undressed skin in that the fibres are not fully differentiated. Contrasting these with Government Exhibit 12 he stated that the latter shows an entirely different structure indicative of a processing treatment which has changed the fibre structure of the skin in such a way that he, having no other evidence to base his conclusions on, would say it had been subjected to a dressing treatment. As to Government Exhibit 13, which was shown to be a photomicrograph of a portion of skin similar to that shown in Government Exhibit 12, except that it had been soaked in water for twenty-four hours before being placed under the microscope, he testified that there was no change from the structure shown in Government Exhibit 12.

This convincing evidence that a chemical change had taken place in the skins covered by Exhibit 1 to advance them to a point where the dressing process may be said to have been started on them, was not rebutted, in my opinion, by plaintiffs' witnesses, either technical or practical.

The strongest evidence offered by the plaintiffs to show that the skins in issue are undressed was that given by what may be termed practical men, who identified themselves as manufacturing furriers and dressers and dyers. I do not regard the testimony of the manufacturing furriers as conclusive on this point since their testimony was limited largely to the effect that they could not use the skins in a commercial way in the condition in which they were imported. This testimony supports the conclusion that the skins are not dressed within the meaning of that term as used in paragraph 1519 (a), but it falls far short of proving that they are undressed within the meaning of that term as used in paragraph 1681. It is obvious that if the skins were only partly dressed they would not be usable in the condition in which imported for manufacturing furriers' use, and yet would not fall into the category of undressed fur skins.

So far as the testimony of the dressers and dyers is concerned, it was directed toward establishing that the process to which the skins at bar were subjected after importation resulted in simultaneously dressing and dyeing them.

It is the contention of the Government that dressing and dyeing are separate and distinct operations and that they cannot proceed simultaneously. This contention receives strong support from the testimony of *plaintiffs'* witness, Rogers, who, on cross-examination, testified as follows:

X Q. What are we going to do with skins like Exhibit 1, sent direct to the dyer who has no dressing establishment? Is that dyer going to dress or dye?—A. He is going to leather that material. He is going to tan and dye it, and dress it. He cannot simply dye the skins without dressing them, oiling them, and putting them in the cage, sawdust, and they have to be cleaned. That is all part of the operation.

X Q. May that all be part of the dyeing operation?—A. No; it would not be part of the dyeing operation. *The dyeing operation is distinct from the tanning operation.* (R. p. 974.) [Italics mine.]

Despite the foregoing testimony from an apparently well-qualified consulting chemical engineer whose work has been largely confined to the leather and fur industries, four "practical" witnesses who identified themselves as "dressers and dyers" testified on behalf of the plaintiffs that they dressed and dyed skins like Exhibit 1 simultaneously by a process known as the wood dye black process.

It appears that since 1930 approximately 90 per centum of all dog-skins imported into the United States from the Orient had been dyed black by the wood dye black process. The four practical witnesses mentioned and one of the Government's witnesses gave in detail the steps in the process, and although there are more or less slight variations in their descriptions, in general the process may be said to consist of the following:

First, the skins are caged to take out dust and dirt.

Second, they are washed in a vat containing a sal soda solution. The vat has a paddle wheel arrangement which agitates the skins, and this washing is continued for two or three hours, being known as a "killing" bath. The purpose of the bath is to swell the fibers of the skin and to remove the grease from the hair so that the dye will adhere more readily to it. There is some question as to whether upon being removed from the bath the skins are merely hydro-extracted to remove the excess solution or whether they are washed in plain water until the run-off is clear, but all of the witnesses who testified for the plaintiffs in the case at bar were agreed that the latter was the fact.

Third, the skins are immersed in a second bath. All of the witnesses who testified as to this procedure were agreed that the second bath contained logwood and turmeric. All of plaintiffs' witnesses were agreed that it also contains fustic and sumac, and all save one testified

that it also contains gambier and nutgalls. The skins stay in this bath approximately 12 hours, and are then taken out and hung on beams over the vat so that the excess dye will drain back for another period of 12 hours.

Fourth, bluestone (copper sulphate), iron liquor (ferrous acetate), and sometimes iron sulphate are added to the second bath and the skins immersed therein for another 12-hour period. There does not seem to be any dispute but that these chemicals develop the color. The skins are taken out of this bath and hung on the same beams for another 12 hours, during which time the air oxidizes the logwood, i. e., in this case it converts it from a colorless compound into a color compound, and the metallic elements, bluestone, iron liquor, and/or iron sulphate, are needed to convert it from a soluble form so that it cannot be washed out again. The procedure of immersion and hanging on beams is repeated three times.

Fifth, the skins are washed in running water until the water runs clear.

Sixth, the skins are washed in salt water.

Seventh, they are dried and a salt and oil emulsion is applied to the skin side.

Eighth, they are again dried and then drummed in damp sawdust.

Ninth, they are then stretched on a machine, drummed with dry sawdust, and then caged to take out the moisture and sawdust.

Tenth, they are combed and brushed and inspected, after which they are finished.

All of the dressers and dyers who testified on behalf of the plaintiffs stated that the foregoing constituted a "dressing and dyeing" process. Under the plaintiffs' theory of the case the process depends for its tanning action on the vegetable tannins contained in the sumac and gambier. There is testimony that the latter are tanning materials, although plaintiffs' witnesses also stated they are also used in the second, or dye, bath as mordants to obtain a surface to which the dyestuff will adhere. It also appears that while the so-called dye-woods, such as logwood, turmeric, fustic, and nutgalls, also placed in that bath, contain tannins, they are primarily dyeing materials, and that to obtain a tanning action through their use an exceedingly large proportion of them would have to be used in the dye bath. As they are expensive materials, the record indicates that they are not used for tanning purposes in the processing of dogskins.

With regard to the tanning action exerted by the sumac and gambier in the second bath, I deem the following testimony of plaintiffs' witness, Orthmann, of great significance:

By Mr. BARNES:

R. Q. Now, within the dressing processes, do you include tanning?—A. I do.

R. Q. I am speaking of dogskins.—A. Yes, sir.

R. Q. And in your opinion is the tannage complete by immersing for a proper length of time in a bath or vat containing a solution in which there is sumac or gambier and logwood and fustic or turmeric?—A. *It depends on the amounts of those you use, Mr. Barnes.*

R. Q. Now, if these amounts ran on upwards from twenty to twenty-five pounds of such combination to the hundred skins, would that tan them?—A. I think it ought to be higher than that. I do not know that it would be quite sufficient to do it properly.

R. Q. Thirty pounds?—A. Yes.

R. Q. Thirty pounds would do it?—A. Thirty to forty pounds.

R. Q. Would there by any doubt of that combination exerting a tanning effect?—A. No.

R. Q. It would do so?—A. It would tan the skins, yes sir. [Italics ours.] R. pp. 933–934.

Hence it is apparent that the quantity of materials used in the so-called wood dye process is important in determining whether a tanning effect *sufficient to bring a raw or undressed skin to the tanned condition* will be exerted on the skin. In this connection the testimony of Government witness Ruderman at pages 650–651 of the record is interesting:

X Q. If skins in the condition of Exhibit 1 were brought into a dressing and dyeing plant, caged or cleaned in some manner, and all the dry extraneous matter that is in them removed, and immersed in a sal soda solution, washed in fresh water, and then put in a vat or bath containing sumac and gambier, would they be tanned by that solution?

      *       *       *       *       *       *       *

A. Depending on the concentration of sumac or gambier or either, as to whether there would be a tannin. There would be a superficial tanning in any case, but they would have to stay in that solution for probably a week. Vegetable tannins take a long time. They are the oldest tanning known in the leather industry, and take probably months to dress with vegetable tannin.

A text-book written by William E. Austin entitled "Fur Dressing and Fur Dyeing" (D. Van Nostrand & Co., 1922), referred to by counsel for the plaintiffs in the brief in the incorporated record (which was made part of the brief herein by reference), and also during the course of the trial of the protests at bar, contains the following reference to vegetable tans at page 65:

### Vegetable tans

In practice, the vegetable tanning matters are not used for furs, although in some special instances gambier cutch may be employed occasionally with some other tan. However, many of these tannins also have dyeing properties, and are used in dyeing the furs. In this connection it must be mentioned that furs dyed with these materials also receive a vegetable tan, *which improves the quality of the leather to a considerable extent.* [Italics added.]

Upon the foregoing being read together with Dr. Rogers' testimony quoted above to the effect that dressing and dyeing are distinct operations, one from the other, it would appear that the wood dye black

process merely *further dresses* fur skins already partly dressed, in addition to dyeing them. Manifestly, any testimony with regard to the action exerted by a bath containing logwood, turmeric, fustic, sumac, and/or gambier, with the addition, possibly, of nutgalls, must be accompanied by a statement of the quantities of these materials present in the bath in order to be of value in determining the question as to whether such bath either (1) brings a raw or undressed skin to the tanned state, as well as initiates the dyeing operation thereon, (2) further dresses an already partly dressed skin in addition to initiating the dyeing operation thereon, or (3) merely acts as the first step in the actual dyeing process.

In the light of the foregoing, the testimony of the dressers and dyers submitted on behalf of the plaintiff, which in no case included a statement of the quantities used, might as well lead to the conclusion that the bath exerted merely a dyeing action, or an additional dressing action to skins already partly tanned, as to the conclusion that the action exerted was sufficient to bring a raw skin to the completely tanned state.

It might be well to note at this point that with regard to the use of the term "tan" as applied to fur skins the record indicates that tannage in the processing of fur skins in the fur industry is not carried to completion, i. e., is not carried to the point where the skin side would be recognized as leather in the leather industry.

At least one witness for the Government and one for the plaintiff immersed portions of Collective Exhibit 1 in water for varying periods up to 12 hours, and, strangely enough, those immersed by the Government's witness, when wrung out and dried, remained soft, while those immersed by plaintiffs' witness became boardy and stiff. This contradiction is an apt illustration of the mass of irreconcilable conflicts in the testimony of witnesses found in this record, the feature in each instance being that the respective opinions of the witnesses support the contention of the party who called them.

Much of the testimony is devoted to the value of this test to determine whether a skin has been dressed, but in view of the foregoing conflict of results it does not seem to be reliable.

I am not unmindful of the contention made by the plaintiff that the skins in issue are merely "cured" for the purpose of preserving them during transportation and up to the point only when a dressing process may be applied to them. I am satisfied from the record, however, that a manufacturing process, namely tanning, has been applied to the skins in issue the effect of which was to carry them beyond the undressed state and to make them ready for either further operations to complete the dressing or for additional dressing and dyeing by the wood dye black process.

I have read with interest the appellate court's opinions in *United States* v. *Arnhold & Co., Inc.*, 22 C. C. P. A. 23, T. D. 47036, and *United States* v. *Rotberg & Krieger, supra.* In both of these cases the dutiable classification of dogskins from China was involved. There will be no dispute, I think, that the dogskins here in issue were in all respects similar to those involved in both of those cases, more especially as it has been shown heretofore that the record in the *Rotberg & Krieger* case, *supra,* was incorporated herein and the plaintiffs rested their *prima facie* case on the record and the samples which represented the importation in that case.

In the *Arnhold* case the court recognized the fact that fur skins may be partly dressed and yet not within the scope of the terms "dressed" or "undressed" as they were used in the Tariff Act of 1922. We quote the following from its opinion:

As we view the case, upon the record now presented, the testimony respecting the question of whether these dogskins, *treating them as furs,* are "dressed" or "undressed", is material and proper to be considered, and the evidence bearing upon this has received our careful scrutiny and analysis, with the result that we conclude it to have been shown that the merchandise may not properly be held to fall definitely within the proper meaning of either "dressed" or "undressed" either commercially or within the common meaning of the terms. In other words, we think the preponderance of the evidence leads to the conclusion that they are *partly* dressed, and only partly dressed, and hence are not properly classifiable as free under paragraph 1579, *supra,* as "undressed furs" or "undressed fur skins," nor under the first part of paragraph 1420, *supra,* as "furs dressed on the skin."

Manifestly the scope of each of the terms, "dressed" and "undressed," as used in the Tariff Act of 1930 is the same as when used in the Tariff Act of 1922.

I also quote the following from the opinion of the Court of Customs and Patent Appeals in the *Rotberg & Krieger* case, *supra:*

\* \* \* As has been stated, merchandise seemingly similar to that here at issue was held, upon the testimonial record made up in the *Arnhold & Co.* case, *supra,* to be neither "dressed" nor *undressed,* but *partly* dressed. Even were such finding made here, there could not be a classification by similitude for the reasons already given, but here we have a different testimonial record, and we think it here has been established (as it was not there established) that the treatment given the merchandise in China, including, of course, the use of the flour, did not constitute a dressing process, and that the merchandise in the condition as imported was not dressed furs or dressed fur skins within the meaning of paragraph 1519 (a), *supra.* Further, we think that the merchandise, being undressed furs, is enumerated and hence there is no place for the application of either provision of paragraph 1558, *supra.* \* \* \*

It will be observed that while the court in the *Rotberg & Krieger* case reached the conclusion that the skins were undressed, it came to that conclusion solely *on the record then before it,* and did not recede from its view of the law that there is a hiatus between the scope of the

terms "dressed" and "undressed" into which a partly dressed skin falls.

Mature consideration of the term "undressed" used in paragraph 1681, *supra,* in the light of the record and of the view expressed by the Court of Customs and Patent Appeals in its decision in the *Arnhold* case, *supra,* leads to the conclusion that as used commonly and in the fur trade of the United States it means one to which no dressing process has been applied. Witness Theis referred to skins the fibers of which were not fully differentiated by a dressing treatment as undressed skins. Various witnesses understood no difference between the terms "raw" and "undressed," and those who made a distinction appear to have regarded the term "undressed" as including only raw and cured or temporarily preserved skins.

I am of the opinion that it has been clearly shown that the process to which the skins at bar were subjected in China was for the purpose of advancing them from the crude state along a line the ultimate end of which was complete dressing, and that such process was not for the purpose of getting the material by itself or for the purpose of temporarily preserving it. I think that it is in a state comparable to that of the processed rubber involved in *United States* v. *Wilkinson Process Rubber Sales Corp.*, 22 C. C. P. A. 60, T. D. 47051, as to which the court said:

The treatment of the crude rubber which brought it to its imported condition constituted, we think, a manufacturing effort which took the crude rubber out of its crude state.

From a careful reading of the opinion of my associates it would appear that their conclusion is based very largely, if not altogether, upon the theory that the treatment of the skins in Collective Exhibit 1 in China was for the sole purpose of temporarily preserving them for transportation to the United States. This view, I think, is supported by the following quotations therefrom:

\* \* \* In that case [T. D. 26368] *as in the case at bar,* the merchandise was *temporarily preserved to prevent decay in transit.*

\* \* \* \* \* \* \*

\* \* \* Manufacturing, if any, was to the same extent, and the use of *temporary preservatives* in China could not constitute a manufacture. [Italics added.]

In contravention of that theory, the fact is that the skins included in Collective Exhibit 1, which are concededly representative of all the skins in issue, were imported into the United States on July 20, 1932, and have been continuously in the custody of this court since November 26, 1934. It would seem passing strange, if they were only temporarily preserved for the purpose of transportation to the United States, that they should be at the present writing in a perfect state of preservation. An examination of the pelt side of the skins

shows that it has been absolutely changed from the natural condition and now has all the appearance of unfinished leather, a condition that manifestly could not be produced by a curing process.

Upon the entire record before us I believe the following findings of fact and conclusions of law would be justified:

Findings of fact: (1) That a dressed fur skin, according to American trade standards, is one which has been subjected at least to processes of tanning, oiling, and cleaning, and is ready for either manufacturing furriers' use or for dyeing; (2) that an undressed fur skin, according to the same standards, is one to which no dressing process has been applied; (3) that the skins in issue were subjected to some dressing treatment prior to importation, the effect of which was to tan or substantially tan them, and that such treatment constituted a manufacturing process.

Conclusions of law: (1) That the skins in issue are not dressed within the meaning of that term as used in paragraph 1519 (a) of the Tariff Act of 1930; (2) that such skins were not undressed within the meaning of that term as used in paragraph 1681 of the same act; (3) that such skins are subject to duty under the provision in paragraph 1558 of the said act for "articles manufactured, in whole or in part, not specially provided for."

That claim in each of the protests should therefore be sustained, the decision of the collector being modified to that extent.