(C. D. 389)

S. M. Brachman & Co. et al. *v.* United States

## United States Customs Court, First Division

(Decided October 25, 1940)

*Barnes, Richardson & Colburn* (*Albert McC. Barnes, Samuel M. Richardson,* and *Hadley S. King* of counsel); *Brooks & Brooks* (*Frederick W. Brooks, Jr.,* of counsel); *Lane & Wallace* (*William H. Fox* of counsel); *Puckhafer, Rode & Rode* (*John D. Rode* of counsel); *Sharretts & Hillis* (*Arthur L. Tallman* of counsel); *Siegel & Mandell* (*Samuel T. Siegel* of counsel); *Strauss & Hedges* (*Hadley S. King* of counsel); *Barrow, Rice & Rockmore* (*Eugene V. Weissman* of counsel); *Abraham H. Goodman;* and *Jordan & Klingaman* (*Jacob L. Klingaman* of counsel) for the plaintiffs.

*Charles D. Lawrence,* Acting Assistant Attorney General (*James F. Donnelly, Marcus Higginbotham, Jr.,* and *Richard F. Weeks,* special attorneys), for the defendant.

Before BROWN and TILSON, Judges

BROWN, Judge: This suit against the United States was brought at New York to recover customs duties claimed to have been illegally collected on certain dogskins imported from China in the period 1930 to 1936.

The collector of customs took duty at 25 per centum ad valorem under paragraph 1519 (a) of the Tariff Act of 1930. Said paragraph reads as follows:

PAR. 1519. (a) Dressed furs and dressed fur skins (except silver or black fox), and plates, mats, linings, strips, and crosses of dressed dog, goat, or kid skins, 25 per centum ad valorem; all the foregoing, if dyed, 30 per centum ad valorem.

(b) Manufactures of fur (except silver or black fox), further advanced than dressing, prepared for use as material (whether or not joined or sewed together) including plates, mats, linings, strips, and crosses (except plates, mats, linings, strips, and crosses of dog, goat, and kid skins), if not dyed, 35 per centum ad valorem; if dyed, 40 per centum ad valorem.

The following claims for classification under paragraphs 1681 and 1558 appear in the protests, the principal claim being under paragraph 1681, reading as follows:

[Free List]

PAR. 1681. Furs and fur skins, not specially provided for, undressed.

Paragraph 1558 reads as follows:

PAR. 1558. That there shall be levied, collected, and paid on the importation of all raw or unmanufactured articles not enumerated or provided for, a duty of 10 per centum ad valorem, and on all articles manufactured, in whole or in part, not specially provided for, a duty of 20 per centum ad valorem.

The tariff act also contains another free list provision dealing with furs reading as follows:

PAR. 1765. Skins of all kinds, raw, and hides not specially provided for.

As the expression "skins of all kinds, raw" would include raw fur skins, it is evident that Congress by including undressed skins in paragraph 1681 intended to cover skins processed beyond the raw state. Moreover, it would seem also from the language of the three provisions that Congress intended to cover in them every kind of fur and fur skin.

This seems to completely negative point V of the defendant's brief where it is vigorously and earnestly argued that in order for a fur skin to be admitted free under paragraph 1681 as "undressed" it must be a "raw" skin. It is there contended that "undressed" and "raw" mean the same thing.

This issue upon practically identical merchandise has been the occasion of long and hotly contested litigation under the Tariff Act of 1930.

This division in a careful and elaborate opinion by Sullivan, Judge, in *Rotberg & Krieger* v. *United States*, 68 Treas. Dec. 895, T. D. 48068, decided December 16, 1935, on what we might call a mixed question of law and fact because it involved the meaning of the terms "dressed" and "undressed," sustained the protest for free entry.

This finding was sustained in *United States* v. *Rotberg & Krieger*, 24 C. C. P. A. 441, T. D. 48902, March 22, 1937, in an elaborate opinion by Garrett, Judge, reviewing the authorities and stating the facts, and concluding that the skins were undressed, the appellate court also, as the law requires, passing upon the weight of the evidence to that effect. That testimony comprised about 140 printed pages. It is incorporated into the record in the case at bar.

The Government did not acquiesce in these decisions but made, as it is called, a second or new case upon subsequent protests. That larger record in a case equally hotly contested runs to 740 printed pages.

This second case, *Arnhold* v. *United States*, was also decided by division one in a full and elaborate opinion by Judge Sullivan on October 11, 1938, 1 Cust. Ct. 170, C. D. 44, reviewing the new evidence and the old evidence in great detail and adhering to the holding in the former case that the merchandise was not dressed fur skins within the provisions of paragraph 1519(a), but fur skins, undressed, and free of duty as such under paragraph 1681, and that being expressly enumerated therein paragraph 1558 covering nonenumerated articles did not apply.

Presiding Judge McClelland concurred in the finding that the dogskins involved were not dressed and therefore could not fall within paragraph 1519 (a), but dissented on the ground that they were, in his opinion, properly dutiable under paragraph 1558 as articles manufactured in whole or in part, not specially provided for. This decision

was affirmed by the appellate court in *United States* v. *Arnhold & Co.*, on October 30, 1939, 27 C. C. P. A. 135, C. A. D. 74.

The Court of Customs and Patent Appeals in the *Arnhold* case quoted from the *Rotberg* case the following statement:

It must be remembered that the sole concern here is with the merchandise in its condition as imported. Four of the witnesses called on behalf of importer qualified as being familiar with that processing of the skins which takes place in China. According to this testimony, it seems that the skins are sometimes, possibly usually (but this is not of importance), taken from the animals in extreme cold weather and placed in piles where they are allowed to lie until the weather becomes warmer. The first process applied to the skins when treatment of them actually begins is to scrape off fat and remove dirt. They are then placed in the sun for drying. After being dried, they are placed in barrels or vats containing water with which there is mixed a flour, described as "dalyon flour," made from some kind of Chinese cereal. They remain in these barrels or vats for several days—one witness says, "perhaps six or seven days." They are then taken out and put in the sun for drying. After being dried, if any are in a very hardened condition such are returned to the barrel or vat, again soaked, and again dried in the sun. After being dried, the skins are packed in bales, 200 to 300 skins to the bale, by press packing machines, and thus exported.

So far as the record discloses, the foregoing constitutes the whole of the processing which takes place in China, and the primary question is, Does such processing render the skins dressed furs or dressed fur skins within the meaning of paragraph 1519 (a), *supra*?

and then stated:

. In the case at bar it is established that, in addition to the process described in the *Rotberg* record, there was employed in the treatment of the skins in China sea salt, to the extent of three-quarters of 1 pound to the gallon of water, and that sea salt contains sodium sulphate and sodium chloride.

The real issue, therefore, is whether, in treating the dogskins in China, the use of sea salt in the quantity above stated, in addition to the water and flour testified to in the *Rotberg* case, rendered the skins dressed or partially dressed.

That court further stated:

While there is some indication in the testimony of some of appellant's experts that aluminum oxide must have been used as a chemical agent in treating the skins in China, all of the chemists testifying upon this point agreed that both dogskins and sea salt contain some aluminum in some of its forms.

They then quote Dr. Theis' testimony as follows:

R. X Q. Dr. Theis, you stated in your direct examination that you had gone to China to make an investigation on behalf of the Treasury Department of the United States, as to the processing of China dogskins. Will you please state whether the following is a correct statement of what you found that China process to be? That the China process consists of an immersing a fleshed dogskin in salt water and millet or cereal flour, the water containing three-quarters to one pound of sea salt to the gallon; that nothing else is added to the mixture.—A. That is essentially correct.

and then stated:

In view of this testimony the only question before us, upon the merits of the case, is whether the treatment of the skins in China by the use of flour, sea salt, and water,

rendered the skins dressed or partially dressed, or whether such treatment was merely for the purpose of preserving the skins in their natural state.

With this statement of the settled law and facts of the case up to that time (it may be treated as such because although the protests are different the issues are identical), these conclusions are, therefore, in effect the law of the case which resulted in the conclusions stated by Judge Lenroot affirming the findings below as stated by Judge Sullivan as follows:

(1) That the article was not correctly classified under paragraph 1519 (a).

(2) That these dogskins are furs undressed within the meaning of paragraph 1681 as previously held.

(3) That paragraph 1558 covering nonenumerated manufactured articles has no application.

In the new case made on the protests at bar the Government now claims the testimony of Mr. Nicholson, supported by that of a certain Chinese chemist, Voss, relates to an entirely new process of preparation in China which requires a different conclusion from that heretofore reached in the two previously decided cases discussed above.

It is true that there is more elaboration of detail in the description. The salt used is shown to be sea salt containing considerable sodium sulphate as well as its main constituent sodium chloride which is also left behind when this sea salt is evaporated in ponds near the shore; that soap pads were used in the washing at the shore; that the temperature became high in the kongs where the skins were placed; and that litmus paper tests showed there was an acid reaction from which it was claimed that fermentation must have taken place in the kongs which did more than preserve them for the long shipment from China.

We think, however, that in effect it is the same previous process which is described with some detail and elaboration rather than a new process which would negative the effect of practically all the previous testimony in the incorporated cases and overcome it so as to now require a holding that these skins are dressed fur skins upon the weight of all the evidence. Litmus responds to and turns pink to such a very slight acid reaction that it would not be reasonable to infer from that that the process had now been turned into a dressing process. Nor do we think that scraping scum off the kongs and reheating part of the liquid and putting it back can be held to have that effect in face of so much testimony of record to the contrary. Therefore, with that contention we are unable to agree.

The Government further contends that the testimony of the western tradesmen in the new record tending to show, without producing samples, that they had bought dogskins which they considered similar to those before us and used a certain proportion to make into fur coats to be sold to country stores, also has the effect of overcoming all the other testimony of record.

Giving this testimony its full weight, there are a number of reasons why the new evidence of the western tradesmen is not sufficiently convincing so as to change the overwhelming weight to the contrary of the previous testimony in the two previous trials of this issue. It admittedly represents the experience of a small percentage of the trade, over 90 per centum being in the New York market. The amounts handled by several of the witnesses during the period in issue were very small, some not over 100 skins. A very considerable proportion of their purchases was not direct imports, but purchases in America. This, without samples, is not necessarily conclusive as to what might have been done to the articles after importation. Much of it was dyed, requiring extensive processing, before being sold for garments, it being manifest from the entire record that most of these dogskins are dyed before being used.

For these and similar reasons and considering the new rebuttal testimony, we adhere to our factual holding in the prior cases that these skins, though not raw, are undressed skins within the meaning of paragraph 1681.

The nonenumerated claim is now alternatively insisted upon by the Government. It is a rare thing in the interpretation of the intention of Congress in passing tariff laws that the nonenumerated section can be held to operate so as to take articles out of the middle of a schedule generally designed on its face, as this fur schedule, dutiable and free, seems to be, to include all types of the group covered by the schedule.

It is true that, in its treatment of this subject under the different language of the act of 1922, the Court of Appeals did apply the similitude paragraph for a likeness to plates and mats of dogskins. *Arnhold & Co.* v. *United States*, 22 C. C. P. A. 23, T. D. 47036. There, however, the clause was general in terms applying to plates and mats whether dressed or not, while here, in the act of 1930, the word "dressed" precedes plates and mats. This renders the use of the similitude part of the nonenumerated section impossible to apply, and suggests that the entire nonenumerated section has no application under the act of 1930 in circumstances like those before us, but that all dogskins are enumerated in the schedule, either as undressed, dressed, or raw.

It is therefore concluded, as before, as matter of law:

(1) That the merchandise at bar is not properly classified under paragraph 1519 (a).

(2) That it is properly classified under paragraph 1681 of the free list.

(3) That, for reasons stated above, the nonenumerated clause has no application here.

Judgment will issue accordingly, directing the collector of customs to refund all duty taken.